All right, the next case we're going to hear is Hanes Caribe v. Global Manufacturers. And is it Mr. Charnas? We'll hear from you. Good morning, and may it please the Court. My name is Adam Charnas, and I represent Hanes Caribe in this appeal. The district court held that it lacked personal jurisdiction over GMC, despite the company's extensive, intentional, and decades-long interactions with North Carolina. However, this Court's decision Let me ask you that. Clearly, if Global sold goods into North Carolina over a long period of time, it availed itself of the laws of North Carolina, the economy of North Carolina, and so forth. But that may be too simplistic for this transaction. It looked to me, and you can respond to this, but it looked to me the entire transaction was consummated in Haiti. The property to the material was retained by Hanes. It was sewed into t-shirts and then sold at the door, at its gate, back to Hanes.  And Hanes became the seller in export to the United States on all the papers. So the entire transaction was local. Now what Global did do is it did, on behalf of Hanes, do the documentation, deliver it to the ship where it was going to go, but it was clearly Hanes was the shipper in every case. It was totally domestic under the contracts, a totally domestic Haitian transaction. The sales were made by Hanes to the United States. It was the seller on all the bills of lading and so forth. And so it seems to me Global is doing a sewing service locally in Haiti and it is not shipping t-shirts for sale. It didn't sell the t-shirts to the United States or to anybody in the United States. It never had title to the t-shirts. It sold only its sewing. That's what I take from the contract. Now you can correct me if I'm wrong. Your Honor, I have a factual response and then a legal response. The factual response is that I think the record, taken in the light most favorable to Hanes, as the standard in universal leather requires, suggests that GMC was the shipper. The contract itself sets up- What do you say was the shipper? Hanes was the shipper. No. If you look at, for example- Global filled out the paper on behalf of Hanes, but the bill of lading is FOB at the- in Haiti's plant and even the insured interest, all the insurance was paid for by Hanes from that point on and the designation of the ship was by Hanes and the address to where they shipped- where Hanes shipped it. Your Honor, if you look at the invoices starting at page 126 of the joint appendix, they list the shipper as global manufacturers. The invoice at page 126, which is 2013, the shipper is global manufacturers. The same thing at page 127, 128. So GMC is listing itself as the shipper. Moreover, the contract itself, if you look at page 21 of the joint appendix, which is the contract, it clearly contemplates that the shipper in this case is GMC. Page 21 of the appendix, paragraph B, says the customs declaration and related- Shipper is the person who sends it there. The seller is Hanes there. Right. The contractor, which is GMC under the contract- That means the person who owns the goods is there. They're not – Global is not selling this into the United States. It has been paid fully for its services and it is the seller. I agree with you, Your Honor, that Global, GMC never has title to the goods at any point in the process, but they are invoices under the contract. It says bill to Hanes. This is the shipping. That's right. And it says ship to somebody in the United States for export. Right. But they are listed as the shipper on the invoices. Mr. Opaid, who is the- That's insignificant if the seller – we're talking about availing themselves. Global did not sell this into the United States. They shipped it to the United States. Global put it – well, they put it on the ship for the person who sold it there, but it was – the goods were being sold by Hanes to the United States. But the same thing was true in Universal Leather. In Universal Leather, the goods were- Let's – let's focus on the question of whether Global availed itself of the laws of North Carolina in putting these goods into North Carolina, and they didn't put these goods into North Carolina. Your Honor, I respectfully disagree. They never had title to the goods. I completely agree with that, but they shipped them- They didn't even have insurable interest. They didn't have title and they were not the seller. But they were the shipper. They didn't have title, but they shipped the goods, $100 million worth of goods, into North Carolina. And in Universal Leather, the exact same thing was true. Quoro, the Argentinian company, sold the goods to- Contract says that they're going to sell the goods to Hanes and they're going to provide the shipment to Hanes' designee. That's right. Hanes picks the designee in the United States and Hanes sells it to the United States. The same thing was true in Universal Leather. Quoro sold the goods FOB Argentina. They weren't even in Quoro, in Universal Leather, Quoro, the Argentinian company, wasn't even the shipper. They handed the goods over. There wasn't even any indication in this Court's opinion in Universal Leather that the Argentinian company knew where the goods were going, that they even knew that they were going to North Carolina as opposed to Utah or Oregon or any other place. They had no role whatsoever in their transport, when in this case- Knowledge is not a – knowledge of where the goods goes is not a basis for a personal jurisdiction. Personal jurisdiction is if a company avails itself of the laws of the local state, in this case North Carolina. And I couldn't find any aspect where Global sold any goods into North Carolina, received any monies from the sales in North Carolina, was paid any monies from it, availed itself of North Carolina laws. They sold the goods to Hanes in Haiti and they carried out the instructions to get it to the right ship. And in every case, the seller was Hanes. Well, yes, the seller was Hanes. GMC never had title to it, but they shipped the goods- They had no control either of any kind. But they shipped the goods to the United States in Universal Leather. They turned over the goods in Argentina. It was FOB Argentina and this Court relied on that fact. Moreover, even if you put that aside, there were numerous contacts with North Carolina. There were business meetings in North Carolina. There were hundreds of communications back and forth between Haiti and North Carolina. As I understand your argument, Universal Leather largely constrains us here because the contacts in Universal Leather were no stronger or no more extensive. In fact, arguably a little less so. Yes, that's our argument. So, okay, so perhaps you could approach, and I think you're weaving this into your response, but you might want to bring it all together and explain to us how you think Universal Leather circumscribes our analysis. Well, a number of respects. As Judge Niemeyer and I were just talking about, I think the circumstances of the North Carolina company in both cases did not have title. In fact, in Universal Leather, they weren't even involved in the shipments, but the shipments, in that case, $4 or $5 million worth of goods were shipped by the North Carolina company into North Carolina from Argentina. In that case, in Universal Leather, there were business solicitations, a few business solicitations in North Carolina. In our case, there were multiple negotiations on contract terms between Haiti and North Carolina, including meetings in North Carolina between GMC officials and Hanes-Karibbe and other folks in North Carolina. And they related to the agreement. They were related to the agreement. The agreement was extended three times, and the evidence in the Jacon Declaration was that those renewals were negotiated between GMC officials in Haiti and between Hanes' employees in North Carolina. There were business meetings regarding GMC's performance of the contract in North Carolina. There were as often as weekly communications, electronic and telephonic, between Haiti and North Carolina. They were ---- And I take your point, the litany that you have given me that supports your argument under Universal Leather. Let me ask the question this way, and I'll ask the same question of Mr. Kauffman. Can we reverse consistent with our precedent in Universal Leather? I think the answer is that Universal Leather dictates a reversal, and not only Universal Leather. Judge King's opinion in CFA Institute, there were much less extensive contacts with Virginia in that case than there are here. In CFA Institute, there was one meeting in Virginia before the contract was formed, and there was one meeting after the contract was formed. And there was a host of telephonic, electronic communications over the years. And here, there were much more extensive contacts between the companies, between GMC in Haiti and North Carolina than there was in CFA Institute. So I think the Court's precedent is, I think, constrains the Court on appeal here. And the district court did not really ---- the district court cited Universal Leather for the standard of review, but didn't deal at all with the holding and the facts in Universal Leather and discuss why Universal Leather did not or how it impacted its decision, let alone why it didn't compel a finding of personal jurisdiction in that case. And it's striking, if you look at the district court's treatment of the facts, the court completely ignores what this court and Universal Leather and many other cases in this court and others have said about the standard of review. I mean, there was no evidentiary hearing here. So the law is clear that all the facts must be construed in the light most favorable to Haynes, all inferences given to Haynes, and Haynes's evidence must ---- the credibility of Haynes's evidence must be assumed. And if you compare the facts of Universal Leather with the facts of our case, as Judge Duncan, as you were ---- as you asked me about, I think this is a stronger ---- this is a fortiori from Universal Leather and CFA Institute. And the district court only got to the purposeful availment prong of the test. As the Court knows, there's three prongs. There's purposeful availment. There's a question of whether the claims arose from the forum state contacts. And then there's the constitutional reasonableness. You know, we think the other two prongs are straightforward here. Roberts. Universal Leather or a specific jurisdiction case? It was, Your Honor. And this is specific jurisdiction? It is. They're both specific jurisdictions. So the contacts have to arise out of the performance of this contract. The argument in this is payment. That's right. That's right. And, in fact, the pricing dispute, which is the heart of the litigation in Haiti that the arbitration question in the Middle District goes to, the pricing dispute was discussed between GMC employees in Haiti and Haines officials in North Carolina. In fact, there were meetings in 2014 and 2015 at which the pricing dispute was discussed. In North Carolina, the copy of the lawsuit in Haiti was sent to Haines Brands in North Carolina. That's what precipitated the action being filed in North Carolina. The payments that dispute were made from North Carolina to GMC's bank in Miami, as it turns out. And the contract over which this dispute arises was renewed and negotiated and discussed extensively in North Carolina. So we think that the claims arose from those contacts. And constitutional reasonableness is a very deferential standard. It's very rare, as this Court said in the ESAB group case, that there would not be constitutional reasonableness. It has to be a compelling case that the forum and litigation in North Carolina would be so gravely difficult and inconvenient that GMC would be unfairly at a severe disadvantage. After their multiple visits to North Carolina over the years to discuss business terms, that's just not a standard that they can satisfy in this case. Thank you. Mr. Coffman. Good morning, Your Honors. My name is Donald Coffman. I'm from the law firm McNeese in Harrisburg, Pennsylvania. I'm here today representing Global Manufacturers. Judge Niemeyer, I think you got it exactly right in your question. Why don't you address Universal Leather? Universal Leather is exactly where I want to go, Your Honor. Thank you. Universal Leather compels, actually, or illustrates why the district court was correct. In Universal Leather, yes, the shipping was FOB Argentina. The shipping here was even more constrained to Haiti, as Your Honor pointed out, because they weren't all the global was doing was assembling and then arranging for shipping at the direction of Haines-Karibe. But the key to Universal Leather was, even though the FOB did not weigh in favor of jurisdiction, what weighed in favor, and the Court emphasizes this very clearly in Universal Leather, is the initiation by the Argentine company, by coming into North Carolina, to initiate the business relationship and to solicit the business relationship. The Court says the crucial factor is vigorous business solicitations in North Carolina, which gave rise to the relationship. In contrast here there was an affirmative seeking, availing itself of the laws of North And exactly, Your Honor, the lower court, in fact, does the lower court does a meticulous job setting forth the facts. You're talking about the lower court here. The lower court here, yes, sir. In Chile. Yes. Does a meticulous job laying forth the facts, going through the e-mails. My point here is that the initiation of this relationship, the only evidence of it comes from my client's principal, Mr. Upade, in his affidavit, who explains that the original business relationship occurred in contacts in the Dominican Republic and in Haiti. The contracted issue here in 2008 occurred as a result of negotiations in Haiti, and the amendment to the contract occurred as a result of negotiations in Haiti. There is no evidence of initiation or solicitation of business in North Carolina. That's the lesson of Universal Leather, which tells us that typically we have found purposeful availment lacking where the locus of the party's interaction was overwhelmingly abroad. Well, that, it would seem to me, is part of the problem. I actually think you have a very good argument. I'm not as persuaded as you that it's so easy to get around Universal Leather. The district court never grappled with Universal Leather, really, which is, I think, a pretty tough, it isn't clear to me how he navigated around it, and the business relationship, although the business was not solicited in North Carolina, as least as I understand it. Please correct me if I'm wrong. There were six business meetings regarding this, and they all took place in North Carolina. It's important to turn to the other case that informs this, and of course there are lots, is from this Court, is SEMCORP, which cites VETROTEX, which was applied by the lower court in this case, which stands for the proposition, which Your Honors have already talked about, only the contract dealings with this contract are at issue in terms of analyzing minimum contacts under the first prong of the test. This contract is 2008 to 2013. The prior business dealings, 96 to 2007, are not at issue, nor are the dealings afterwards, the dealings in 2014 and 2015. Some of them are, though, aren't they? They occur, but they don't relate, they are not during the period of this contract. And in fact, I need to go back to that. I thought that at least two of them did have to do with the 2008-2013 agreement. No. So, yes, Your Honor, you're correct. So what the lower court does is it says, first of all, it looks at the Chacon affidavit, which talks about these communications, and it says we must slice away all those after the contract expires, and all those that occur before. And if you look at Mr. Chacon's affidavit, what he's talking about is the contacts over the 20-year course of the relationship, and he doesn't produce the evidence for their prima facie case of sufficient contacts within the relationship, and the lower court parses them. So it looks to the six conversations that you're talking about and says, well, in fact, only two of those occurred during the contract period. It looks to the six conversations that you're talking about and says, well, in fact,  It was the only two they had as our the two business meetings that they had, wasn't it? Well, they're having business meetings in Haiti. Okay. So we're talking about two contacts over the course of an 8-year relationship over an 8-year contract that are in person. And then the lower court parses the e-mails and notes that the, of course, e-mails alone are not sufficient to support a finding of minimum contacts. There's plenty of case law on that.     from North Carolina to Haiti. What also has to be pointed out here is that the parent company, Hanes Brands, it's problematic to refer to the plaintiff here as Hanes. It is Hanes Caribe. It is a Cayman Islands corporation that came to Haiti to do business. And the ---- Well, every time I use the word Hanes in my ---- I understand that, Your Honor. ---- Caribe. Absolutely, Your Honor. But there's a little bit of ---- Part of the transaction. But there is a little more than a little bit of blurring that goes on in the plaintiff's art, if I may say. Hanes Brands owns Hanes Caribe. It is a 100% owned city area, Your Honor. Hanes Brands is down in Winston City. Yes. And it's rather a case of wanting to have your cake and eat it, too, when they want to be a Cayman Islands company. So be it. But they do blur the distinction by way of example. Page 42 of Appellate's brief, when it's talking about constitutional reasonableness. It was all the manufacturing in Haiti and then the litigating in North Carolina. I'm sorry. I didn't ---- I'm impetuous. The Appellate's brief, when it's talking about constitutional reasonableness, says that North Carolina has an interest in providing its residents means of relief. But Hanes, the mothership, the parent corporation, is not the party seeking relief here. This is a Cayman Islands company that's doing international forum shopping because it doesn't like the fact that it's litigating in a court that does have jurisdiction, which is so important in this case. The Haitian court is litigating this dispute. The Haitian court has considered the question of arbitration. He says you can't use that here. Yes, he does. There's a lot of things they want you to ignore, Your Honor. We couldn't traditionally notice it because those Haitian courts aren't reliable. I'm very happy to address that, Your Honor. And ---- Well, that's what they're saying. That's what they're saying. And that actually goes to a ---- that's not about minimum contacts. That goes to the first filed argument, which is a separate basis which the lower court never had to reach because it dismissed on the basis of the first prompt. I wouldn't advise you go in that direction. Well, then I won't go that direction, Your Honor. I'm better listening in. It's pretty tempting, but I'll leave it to my brief. Thank you, Your Honor. I will not go in that direction. Let me go back, then, if I can choose a new direction. I mean, just to be a little less mysterious, the notion that an action filed second is illegitimate and the court has no jurisdiction of it and it has to be dismissed because there is another action just as contrary to every Supreme Court case, the Fortes case and all those cases which say courts can litigate until the end, until one gets a final judgment, and then you can use the res judicata effect. But the notion, the first filed dismissal, I do not think has a lot of support in the principles of our American jurisprudence. You can file cases in six courts and proceed until you get to final judgment. Once you get there, you can then interpose the judgment as a defense to all the others and get them dismissed. That's the learning of the Supreme Court. If I may be so bold as to respond to that. Go ahead. I opened it up. And then told me not to step through the door. I only told you not to first. We're dealing here with the first filed action. It's also sometimes called international abstention doctrine, but when it comes down to its Colorado River, which does establish the factors under which one court will defer to another. And when we stay in Colorado River, a stay basically means a dismissal. And you could stay here, Your Honor, or dismiss. I understand, but I see it to deprive a court of its legitimate jurisdiction because in other cases pending, it's pretty aggressive. And in Colorado River, these other cases recognize the ability of cases to go ahead and even younger in all these other cases are notions that we defer and may stay. But here we have two commercial courts litigating two cases. And just because one was first filed doesn't mean the other one has to be dismissed. Until you get to final judgment. The other one actually seeks to stop the first one. Well, that's another issue. That's a you get in the Anti-Injunction Act type of thing. But if I could address first Judge King's question about whether you should even look at the Haitian opinion, and then your point is what does it matter. But whether or not you should look at it at all has to do with a case called Hilton v. Gaiot, which is cited in a footnote of our brief. It's the Supreme Court. The way judicial notice works is that it is a presumption, which has to be overcome by the party challenging it, that the issuing court has jurisdiction and its decision is issued upon notice and with regularity of proceedings. And all they've done in their reply brief is cite something from the Internet to attack the integrity of the Haitian courts. That doesn't carry their burden to overcome that presumption. So once you take judicial notice of it, you say yes, that's an opinion. Does your opinion have all the ribbons? It has the, it's got the blue stamp, it's got the ribbon. Was that, did you prove that that translation's good? Yes, we hired a translation service, the translation service in turn. And you proved that the translation's a good translation? We attached an affidavit from the translation service. That is our proof that the translation is good. Much like the Haines-Karide did in its complaint. It attached the Haitian complaint with a translation service, and we, of course, didn't challenge the authenticity of that Haitian complaint. On top of which, I'm the one who filed it. I'm an officer of the court. I'm the one who made the motion and said this is the opinion of the Haitian court. The significance of that opinion is only to show that the issue of arbitration, which they seek to litigate here, has been raised by Haines-Karide and decided by the first level of that court. That litigation, by the way, and this is not a record, but if you want to know, is not over. It is on appeal. Now, let me ask you, if it's affirmed on appeal, the final appeal, what respect, if any, does an American court give a judgment like that? I am not an expert on, first, on the enforcement of foreign judgments, Your Honor, so I would only be speculating I apologize. It's just not something that I know about. And it follows a little from my notion that when we get into this first file to justify a dismissal of an action, I think that's a most aggressive position. And it seems to me if the district court has jurisdiction, the district court can exercise a jurisdiction until there's some bar by race, judicata, or respect for a foreign judgment or whatever. And I will agree, Your Honor, well, we feel first file is a good argument. It's not the hill I want to die on. I want to go back to focus on the patent cases. A lot of these things arose in patent cases. And so one person sues for patent infringement. And the other goes to another forum and sues for declaratory judgment declaring the patent invalid. And the Supreme Court has addressed that issue. And basically, both of them can go ahead. And it's the four test case. And you may favor the first one if the second one is just parallel. But if the second one is broader in scope and in parties, you may favor the second one. It's a very complex doctrine. The idea that you're going to throw out a case in a North Carolina district court because there's been some previous filing, my only suggestion is that is a hard road to hoe. And I'm not sure there's any respective case law that supports that. My last 30 seconds with that hoe is that what they're seeking to do in the North Carolina litigation in Haiti because of the arbitration clause on which the Haitian court is overruled. The court you're up here, the North Carolina judge has ruined your favor. Yes. Right. Yes. Yes. And never reached. Down there in Haiti, that's a trial court ruling. Yes. And there's a how many levels of appeal courts are there? Two more. Well, two. So there's an intermediate appeal in the Supreme Court of Haiti. If need be, if it is taken. So it's before the intermediate court. And the trial court ruled the question of arbitration. The language in Haiti is what? French? Yes, your honor. And so the translation is from the French to the English. The opinion was in French and you translated it or had. I had my my French is. No, but you had to translate it by someone who was qualified. Yes. You're telling us that it was a qualified translator and it's all proper. Yes, it's proper for you to take a look at it, to take judicial notice of it. And the question is, what weight does it have at all? It only relates to first five. It doesn't have anything to do with the affirming the lower court on the basis of what the lower court correctly found, which is the lack of minimum context. And let me note that a universal leather, which was, as your honor pointed out, a specific jurisdiction case, the when this court reversed, it remanded to the trial court to consider the second and third prongs and also pointed out that it was it was reversing because it thought that there was a prima facie case, but it remained to be determined perhaps through fact finding in the court below as to whether that prima facie case would ultimately be sustained when the facts were put before the court in a hearing. So all I'm suggesting, your honor, is that you can certainly obviously sustain or affirm the lower court on the basis that it was correct on minimum contacts. There are the second and third prongs, and I will address them very briefly. The second prong also supports a finding of lack of jurisdiction. The claims must arise from the defendant's contacts with the foreign state. And again, we're only looking at those contacts that deal with this 2008 contract, contacts that are initiated by GMC. So they are really few and far between and attenuated. That's not what the claim arises from. The claim arises from the business relationship in Haiti, the underpayments in Haiti that had to do with, as your honor pointed out, a performance by GMC, which entirely took place in Haiti. Is it fair to conclude that the contract in Haiti was really a service contract and not a sale of goods? In other words, it was just to sew the materials. Yes. The material title was retained by Hanes before and after. And so the payment was just for the sewing effort. And arranging for the shipping, which was done at the direction of Hanes, my learned opponent referred to the contract, and I thought it might be taking a look at what your honor obviously looked at. The provision in the contract, the JA-24, which is in section 9, which says what your honor already understood, which is the shipping was done at the direction of Hanes-Karibe and so on and so forth. But, yes, all GMC does is they never take title. They assemble the garments. They're told where to send it for shipping. They send it there for shipping. And once it's so they never take title to the goods, and the goods are shipped at Hanes-Karibe's direction. Hanes is the seller. Hanes is the insurer. And all they're doing is assembling. In fact, even the machines they're working on are supplied by Hanes-Karibe in Haiti. It is an assembling operation. It is providing labor for that purpose. That's what was going on. Let me see if there's anything else I desperately need to talk to you about. Oh, the business of fact-finding and whether the lower court, my opponent raised the notion that the lower court was balancing facts against each other and wasn't following the proper standard of review, which is, of course, on the prima facie case to give them the benefit of inferences where there are disputed facts. I would suggest that the lower court didn't do that at all. There is no dispute that the Not to me like the historical facts nobody disagrees with. No, and nor is there any challenge by as is set forth in the appellant's brief. They do not challenge the court's findings of fact. They agree that the standard review is clearly erroneous, and they say that's not an issue in this case. So I think the best thing I can say is that the lower court's opinion is well, I've been doing this for a long time, and I didn't know whether to say this, but I'm going to say it. The lower court's opinion is remarkable in its meticulousness, in the time that was taken, in the length that it is, and in its parsing of the facts, facts by facts by facts, following exactly the framework that's set forth in Universal Leather, starting with where was this contract formed, to how was this contract performed, to understanding the significance of the shipping terms in the contract, to parsing the e-mails, to parsing the individual visits. So the weighing, and the court was not balancing, it's not a scale of justice thing, facts against jurisdiction, facts jurisdiction. It's more like a scale at the grocer's, where you just, what you're doing is putting the facts on the scale and seeing if they weigh enough to create the minimum context that meet the test of purposeful availment. And so the fact that there aren't offices and there isn't property and there aren't employees in North Carolina, all of those are of zero weight. They're not moving the scale towards jurisdiction. And when you slice away the facts that don't count, because we're only interested in facts from 2008 to 2013, the weight isn't there, and that's what the lower court was saying. There's one last thing I should point out that is in the record, Your Honor, but it's sort of remotely in the record, and I wanted to make something clear. The opposing counsel in their brief refers frequently to events after the expiration of the 2008 contract, and said the parties continued in their business relationship. And in Mr. Appad's affidavit, which is part of the joint appendix, so just take a second, of the joint appendix, he makes reference in paragraph 16 of his affidavit to, he says, following the last expiration date of the 2008 contract, December 2013, GMC and Cain's Caribe continued to do business with no written agreement. After working for nine months past that expiration date, this is important, GMC was notified that it had been working without a contract and that going forward, I'm going to be out of my time. May I continue, Your Honor? Scalia. Well, it's not over yet. Go ahead. Verrilli, two seconds. Ford would work on a purchase order by purchase order basis, see Exhibit 8, to affidavit of Andrea M. Appad at docket 20. Docket 20 is in the lower court record. I apologize, it's not in the joint appendix, but it's in the lower court record and is in the record for this Court. And what Mr. Appad did in that affidavit was attach the letter from Cain's Caribe after the contract expired that said, that contract's over. Those terms don't apply anymore. So when we talk about contacts that occur after the expiration of the contract or not. Well, what it comes down to is on the specific jurisdiction, the claim has to arise out of the specific contacts made with the jurisdiction as opposed to a general  Absolutely. A general jurisdiction is a heavier burden to carry. And they have to be related to the contract at issue. Related to the contract, the claim at issue, right.  Thank you, Your Honor. All right. Mr. Charnas. Thank you, Your Honor. I respectfully disagree, Your Honor, with your comment that there's no dispute about historical facts here because my learned counsel, my learned colleague on the other side and Judge Tilly have both slanted the facts dramatically and given the inferences to GMC. For example, it is true that there's no evidence in the record one way or the other about the initiation of this contract. But there is evidence in the record, pages 107 and 108 of the joint appendix, about the renewals of the 2008 contract. There were three renewals. And our evidence was the Chaconne Declaration expressly says that those renewals were negotiated between GMC officials in Haiti and between officials in North Carolina. And so the renewals of the contract were negotiated via contacts with North Carolina. And as the First Circuit said in the C.W. Downer case, when you have a very long, and here we have a 20-plus year relationship, the question of how that relationship began, whether that was initiated in the forum is of particularly less relevance. And this Court in the, and the Supreme Court said the same thing as well. And this Court in the Christian Scientist case said the defendant need not initiate the minimum contacts to have purposely availed himself of the forum's law. With respect to what happened after the termination of the contract, we think Judge Tilly just got that wrong as well for a couple of reasons. First of all, as I referenced when I was up before, there were numerous discussions about the dispute, the pricing dispute, under the 2008 contract after the termination of the contract. Those are clearly related to the 2008 contract. And even if they happen after expiration, they sort of count even if you only look at that contract. And there were meetings in North Carolina, meetings in North Carolina between GMC employees and Hanes Brand's employees that related to the pricing dispute under the 2008 contract. There were communications sent by GMC to North Carolina related to that pricing dispute after the expiration of the contract. And there's no rationale whatsoever for why those wouldn't count toward minimum contacts. There is a clear rationale if you want to provoke that response. It seems to me when you have a contract that's entirely performed in Haiti and is carried out in Haiti and it's really a service contract assembling materials, and then you have a dispute about it and the issue of dispute is sucked into the parent's home office in order to figure out what to do. I don't see how that's purposely availing themselves of the laws of North Carolina to do business there. That's in order to resolve a dispute that arose in Haiti over the breach of the contract or alleged breach. There's a payment issue. Well, but I would quibble with the factual premise of your question with respect, Your Honor, because during the entire course of this relationship, there were constant communication. It wasn't like North Carolina appeared at the end. It seems to me you really have to get at the notion of whether a company purposely avails itself of the economics and laws of a particular state, takes advantage of the economic gain and the laws and the protections of a state in order to justify that state's exercising jurisdiction. And the idea that we have some of these contacts, none of which is global trying to do business in North Carolina. That's not true, Your Honor. They clearly wanted to do business in Haiti and were localized and carried out two functions. One is to assemble Haynes' materials into t-shirts or whatever items there were. And number two, to arrange for the shipping to Haynes' designee in the United States. And... Well, but Your Honor, the exact same thing was true in Universal Leather. Except Universal Leather said that they purposely availed themselves of North Carolina. They initiated the contacts and solicited in North Carolina. There's no solicitation here. This contract was a service contract provided to Haynes so that Haynes could ship into the United States. Well, Your Honor, there was no evidence one way or the other about who solicited the contract or the business relationship initially. But there is evidence in the record that the... Except that Global was not selling these t-shirts. They were not selling them to anybody in the United States. It didn't care whether they sold in the United States to Missouri to whatever. They were a service contract providing for... Just a minute. They're providing for a service for the assembly of materials that belonged to somebody else. And they were not selling these goods. Well, I agree with your factual description of the services they provided. But the exact same thing seems true in Universal Leather. In Universal Leather, Quoro... Except that Universal Leather actually, if Mr. Kaufman's right, Universal Leather turned on the notion that the Argentina company solicited and availed itself of the laws of North Carolina. And that was its intent and purpose. And... That was one of the factors the court looked at. And I think the same thing is true here. That's an international shoe in all of these. That's absolutely, sorry, that's absolutely true, Your Honor. But they, just as in this case, they turned over the goods to Universal Leather in Argentina. They didn't even ship, they weren't even the shipper in Universal Leather. But their purpose was and came solicit to create a market to avail themselves of the laws. That's a totally different... In other words, that hits the constitutional standard, which is to purposely avail yourself of the laws. Do you disagree that... Do you disagree with Mr. Kaufman's characterization of Universal Leather in that the decision found the fact of the... Argentinian government availing itself of contacts in the United States determinative? Did you follow that sentence? I'm not sure I did. I think he placed emphasis on the fact that there was initially, the initial solicitation by the Argentinian company in North Carolina. And here... Yes. My question is, do you agree with Mr. Kaufman's characterization that that was a significant factor in the jurisdictional analysis? I think it was a factor in Universal Leather. I think we have the same factor here because there was evidence, there's evidence in the Chacon Affidavit, which that the GMC solicited renewals and extensions of the contract in North Carolina, physically in meetings in North Carolina. That contract also had a North Carolina choice of law provision, which... This is the quote from Universal Leather. The court relied on the affidavits of description of, quote, vigorous business solicitations undertaken by Coro in North Carolina, which gave rise to a new two-year relationship between the parties that spanned a series of transactions and resulted in the sales of millions of dollars. That is 100 percent different from the facts in this case. Well, Your Honor, we just respectfully disagree with you if you read the Chacon Affidavit and give all inferences to that affidavit. We can read those, but I'm suggesting to you that Mr. Kaufman's argument is that Global did not solicit and generate the business that it performed, that is the sewing services or assembly services. It did not come to North Carolina to sell that into North Carolina. Indeed, they provide for the arbitration in Miami and provide for the payment in Miami, which is sort of interesting too, which avoids North Carolina. The only North Carolina contact they have in the contract is they're going to apply North Carolina law substantively. May I respond, Your Honor? Yeah. I think, again, we just simply disagree respectfully on the facts that they were solicitations of the evidence in the record is that they were solicitations of renewal of the contract, the three renewals were solicited to North Carolina. There were numerous meetings. There were weekly, almost weekly communications about production. Mr. Kaufman said that they all went from North Carolina to Haiti. That's, with respect, that's not true. Mr. Tarnas, I think it is certainly true, and perhaps this is part of your answer, that there were solicitations in North Carolina of relationships, continuations of relationships, as opposed to initiation of relationships. And I think that's the, you're saying that the distinction doesn't, it's a distinction without a difference. I think that's right. Is that fair? That's right. The initiation of the relationship was so long ago that, for these purposes, we weren't able to determine who solicited. Who determined it initially 20-plus years ago. But the clue is the renewals were solicited in North Carolina by GMC. Thank you. Thank you. We'll come down and greet counsel and take a short recess. This honorable court will take a brief recess.
judges: Paul V. Niemeyer, Robert B. King, Allyson K. Duncan